## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

WBK SHREVEPORT LLC, ET AL.                CIVIL ACTION NO. 24-0393

VERSUS                                    JUDGE S. MAURICE HICKS, JR.

KASE GROUP, ET AL.                        MAGISTRATE JUDGE HORNSBY

### MEMORANDUM RULING

Before the Court is a Rule 12(b)(6) Partial Motion to Dismiss filed by Defendant The Kase Group ("TKG") and adopted by Defendant Jeff Gates ("Gates") (collectively "Defendants"). See Record Documents 15 & 30. The motion seeks dismissal of claims made by Plaintiffs WBK Shreveport, LLC ("WBK Shreveport") and JRA Properties, LLC ("JRA Properties") (collectively "Plaintiffs") under the Securities Act of 1933 and Louisiana Blue Sky Laws. See id. Plaintiffs opposed the motion, and TKG replied. See Record Documents 17, 32 & 18. For the reasons stated below, TKG and Gates's Rule 12(b)(6) Partial Motion to Dismiss (Record Documents 15 & 30) is **DENIED**.

### BACKGROUND

The facts alleged in the Complaint are as follows. Mountain Express Oil Company's ("Mountain Express") business model involves buying properties and selling them to Oak Street Real Estate Capital, LLC ("Oak Street"). See Record Document 1 at ¶ 9. Oak Street, in turn, leases the properties back to Mountain Express. See id. In May 2022, a Mountain Express affiliate, Time and Water LLC ("Time and Water"), purchased a "convenience store fueling property" in Shreveport, Louisiana (the "Property"). Id. at ¶ 7. Time and Water offered to sell the Property to Oak Street, but Oak Street declined. See id. at ¶ 10. Thereafter, Time and Water "engaged [TKG] and its now former director, Gates,

to market and sell the Property." Id. at ¶ 11. TKG and Gates were entitled to a commission from the sale. See id.

Based on TKG and Gates's marketing of the Property, JRA Properties[1] entered an Agreement to Purchase and Sell Commercial Property (the "PSA"), and several supplemental agreements that were incorporated into the PSA.[2]  See id. at ¶ 21. Relevant terms of the PSA include: a sale price of $915,000; full restoration of the Property by Mountain Express within twelve months of closing; and a lease agreement with Mountain Express with a twenty-year term at $54,000 annual base rent with 1.75% annual increases. See Record Document 1-3 at 1. Not all of these terms were explicitly incorporated into the ultimate Act of Sale. See Record Document 1-5.

In December 2022, Time and Water and JRA Properties entered a "Fourth Amendment to Purchase and Sale Agreement" (the "Fourth PSA Amendment"). Record Document 1-4. The Fourth PSA Supplement provides that specific renovations would be completed within three months of sale, including restorations and repairs to the main electrical panels and service lines, HVAC system, refrigeration components, and plumbing lines and systems.[3] See id. at 1-2. It also provides that within three months, the

---

[1] JRA Properties and WBK Shreveport "are affiliates, sharing the same single member." Record Document 1 at ¶ 5.

[2] "Prior to the sale to Plaintiff[s], Mountain Express caused its affiliate, Time and Water LLC, to sell the Property to Mountain Express." See Record Document 1 at ¶ 24 n.7. Therefore, Mountain Express is listed as the seller of the property. See Record Document 1-5 at 1.

[3] It is unclear whether Mountain Express's agreement to perform certain renovations within a three-month period superseded or otherwise affected its obligation to complete a full renovation under the PSA. See Record Document 1-4. However, the renovations Mountain Express agreed to complete within the three-month period were extensive, spanning from structural renovations to more cosmetic rebranding. Neither party argues

location would be rebranded and new fuel pumps would be installed. See id. at 2. If the specified renovations were not completed, before the end of the sixty-day timeframe, Plaintiffs would have the option to sell the property back to Mountain Express at their "sole and absolute discretion." Id. at 1.

On December 15, 2022, Plaintiffs and Mountain Express signed the Act of Sale. See Record Document 1-5 at 1. The Act of Sale did not include the provisions about full restoration or the affiliate leasing provision. See id. at 1-3. However, it did include the provisions setting a sale price of $915,000 and incorporating the three-month buyback provision and related renovations as detailed in the Fourth PSA Amendment. See id. at 2. After the parties completed the sale, Plaintiffs and a Mountain Express affiliate signed a Master Lease Agreement providing for a twenty-year term with four extension options of five years each, among other terms. See Record Document 1 at ¶ 25.

On March 17, 2023, Mountain Express and its affiliate leasing the Property under the PSA[4] declared bankruptcy. See id. at ¶ 26. JRA Properties attempted to invoke its right to sell, but its "demand was rejected in light of the pending Bankruptcy Case." Id. at ¶ 27. On August 24, 2023, the Bankruptcy Court ordered termination of all Mountain Express and its affiliates' non-residential leases, including the affiliate's lease with WBK Shreveport and JRA Properties under the PSA. See id. at ¶ 28. Mountain Express did not

that the extent of renovations promised should affect the Court's analysis under these circumstances. Therefore, the Court declines to determine if the obligation to perform a full restoration was operative at the time of the alleged breach at the Rule 12(b)(6) stage.

[4] The Mountain Express affiliate leasing the property was MEX RE-SW-LA, LLC. See Record Document 1 at ¶ 26.

make the renovations or repairs provided for in the parties' Fourth PSA Amendment. <u>See</u> <u>id.</u> at ¶ 29.

On March 18, 2024, WBK Shreveport and JRA Properties filed suit in the Western District of Louisiana for breach of fiduciary duties and negligent misrepresentation, fraud, breaches under the Securities Act of 1933 and Louisiana securities laws (or "Louisiana Blue Sky Laws"), unfair trade practices, detrimental reliance, respondeat superior, and vicarious liability. <u>See</u> Record Document 1. Defendants subsequently filed the instant motion seeking dismissal of Plaintiffs' claims under federal and state securities laws. <u>See</u> Record Documents 15 & 30. Defendants contend that the claims fail as a matter of law because the sale of the Property does not constitute a security such that it is subject to federal or state securities laws. Plaintiffs oppose the motion, arguing that the transaction meets the three-prong <u>Howey</u> test for a security. <u>See</u> Record Documents 17 & 30.

## LAW AND ANALYSIS

Rule 8(a)(2) of the Federal Rules of Civil Procedure governs the requirements for pleadings that state a claim for relief and requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To determine whether a complaint is adequate under Rule 8(a)(2), courts now apply the "plausibility" standard established in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and its progeny. Under this standard, "factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Twombly</u>, 550 U.S. at 555-56. If a pleading only contains "labels and conclusions" and "a formulaic recitation of the elements of a cause of action,"

the pleading does not meet the standards of Rule 8(a)(2). <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citation omitted).

Additionally, courts must accept all allegations in a complaint as true. <u>See</u> <u>Iqbal</u>, 556 U.S. at 678. However, courts do not have to accept legal conclusions as fact. <u>See id.</u> Courts considering a motion to dismiss under Rule 12(b)(6) are only obligated to allow those complaints that are facially plausible under the <u>Iqbal</u> and <u>Twombly</u> standard to survive. <u>See id.</u> at 678-79. If the complaint does not meet this standard, it can be dismissed for failure to state a claim upon which relief can be granted. <u>See id.</u>

I.    **Securities Act of 1933**

A.  **The <u>Howey</u> Test**

To determine whether an instrument qualifies as a security, the Fifth Circuit implements a three-element test articulated by the United States Supreme Court in <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293 (1946) ("<u>Howey</u>"). All three elements must be present for the transaction to constitute a security. <u>See</u> <u>Westchester Corp. v. Peat, Marwick, Mitchell & Co.</u>, 626 F.2d 1212, 1215 (5th Cir. 1980) (citing <u>Cameron v. Outdoor Resorts of Am., Inc.</u>, 608 F.2d 187, 192-93 (5th Cir. 1979)). The three elements are: (1) "there is an investment of money," (2) "the scheme in which an investment is made functions as a common enterprise," and (3) "under the scheme, profits are derived solely from the efforts of individuals other than the investors." <u>Matter of Living Benefits Asset Mgmt., L.L.C.</u>, 916 F.3d 528, 535 (5th Cir. 2019) (quoting <u>SEC v. Koscot Interplanetary, Inc.</u>, 497 F.2d 473, 477 (5th Cir. 1974)). The Fifth Circuit interprets this test "broadly." <u>Id.</u>

### i.    Common Enterprise

The second element of the <u>Howey</u> test is that the investment of money was made in a "common enterprise." <u>Id.</u> To determine whether a common enterprise exists, the Fifth Circuit utilizes a "broad vertical commonality test," which requires interdependence between the parties. <u>See id.</u>; <u>Long v. Shultz Cattle Co.</u>, 881 F.2d 129, 140-41 (5th Cir. 1989). Interdependence exists where "the fortuity of the investments collectively is essentially dependent upon promoter expertise." <u>Id.</u> (quoting <u>SEC v. Cont'l Commodities Corp.</u>, 497 F.2d 516, 522 (5th Cir. 1974)); <u>see also BKK Sols., LLC v. Sensiva Health, LLC</u>, No. 22-CV-2165, 2023 WL 11884719, at *4 (E.D. La. Mar. 1, 2023) ("The critical factor is the 'uniformity of impact of the promoter's decisions.'") (quoting <u>Long</u>, 881 F.2d at 140). While other circuits require investors to share profits or losses to meet this element, the Fifth Circuit has explicitly rejected such a requirement. <u>Long</u>, 881 F.2d at 141.

### ii.    Profits Derived from Efforts of Others

The third element of the <u>Howey</u> test is that "under the scheme, profits are derived solely from the efforts of individuals other than the investors." <u>See Matter of Living Benefits Asset Mgmt., L.L.C.</u>, 916 F.3d at 535. "Uncontroversially, the word 'solely' in the third prong of the <u>Howey</u> test has not been construed literally." <u>Id.</u> (quoting <u>Long</u>, 881 F.2d at 133). Instead, the third element is met where "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." <u>Id.</u> at 536 (quoting <u>Williamson v. Tucker</u>, 645 F.2d 404, 418 (5th Cir. 1981) (en banc)).

6

To determine whether an investor has control over the asset, the court does not look to the actual control the purchaser could have exercised over the investment. See Williamson v. Tucker, 645 F.2d 404 (5th Cir. 1981). Rather, the court looks to whether investors "can and do utilize their powers." SEC v. Arcturus Corp., 928 F.3d 400, 410 (5th Cir. 2019); see also SEC v. Sethi, 910 F.3d 198, 205 (5th Cir. 2018) (explaining that where an investor's control over an investment is illusory or is otherwise blocked, that purported control does not satisfy this element). However, a situation where an investor merely "ch[ooses] to hire another party to manage their investment" is insufficient to satisfy the third element. Williamson, 645 F.2d at 423.

### B. Application

#### i.    Parties' Arguments

The parties do not dispute that the first prong of the Howey test has been met, that is, that there was an investment of money. See Matter of Living Benefits Asset Mgmt., L.L.C., 916 F.3d at 535. Indeed, Plaintiffs paid $915,000 consideration for the Property. See Record Document 1 at ¶ 21. However, the parties disagree about whether the second and third elements have been met.

As to the second prong of the Howey test, Defendants contend that the transaction fails because there is neither horizontal commonality (wherein multiple investors pool their funds into one joint investment) nor vertical commonality (wherein an investor's income is directly dependent on a promoter's success). See Record Document 15-1 at 13-14. Plaintiffs respond that Defendants cite to the wrong standards and that, under the broad vertical commonality test used by the Fifth Circuit, the transaction operated as a common enterprise because Plaintiffs relied on Defendants' information, knowledge, and

7

expertise. See id. at 7-8. Plaintiffs argue that it is immaterial whether its share of profits or losses were directly correlated or shared with Defendants. See id. at 8.

As to the third prong of the Howey test, Defendants argue that the transaction fails because the investors' profits were not to come solely through the lease agreement, and Plaintiffs "still own[] a valuable piece of commercial property." Record Document 15-1 at 15. Defendants also argue that the Fifth Circuit has not "abandoned" the third element of the Howey test and suggest that consideration of the second and third elements together is improper.[5] See Record Document 18 at 1. Plaintiffs respond that Howey specifically provides that "whether there is a sale of property with or without intrinsic value" is immaterial to the third prong of the test. Record Document 17-1 at 8. Plaintiffs further argue that they were essentially "led to expect profits" based on Defendants' actions because the PSA required renovations to be made to the land and the land is derelict without those renovations. See id. at 9-10.

---

[5] On reply, Defendants also suggest that the second and third elements of the Howey test should be applied differently because the Defendants were promoters of the property, not the ultimate sellers. See Record Document 18 at 2-3; see also Record Document 15-1 at 15 n.34. However, Defendants do not cite any authority to suggest that Defendants' role as a promoter affects whether the transaction definitionally constitutes a security.

The test at hand does not appear to require that the investor be in a common enterprise with the defendant nor that they rely on the defendant for profits. It provides that the investors must invest money in a common enterprise with some other party and are reliant on some other party for profits. The question now before the Court is whether, taking the facts as alleged in the Complaint as true, Plaintiffs entered a transaction wherein they invested money in a common enterprise and were dependent on another party for profits under the agreement. As set forth infra, the Court finds that Plaintiffs have done so. If Defendants' specific role as promoters in this transaction has any other bearing on questions of liability, those questions are inappropriate for resolution at this stage.

### ii.    Application of the <u>Howey</u> Elements

The Court begins its analysis by noting that it largely considers the second and third elements in tandem. The jurisprudence explains that the second and third elements can become "blurred" together because they both look to whether the investor is essentially dependent on the promoter alone for profits. Indeed, "[u]nder th[e Fifth] [C]ircuit's broad vertical commonality approach, the second and third prongs of the <u>Howey</u> test may in some cases overlap to a significant degree." <u>Matter of Living Benefits Asset Mgmt., L.L.C.</u>, 916 F.3d at 536 (citation omitted).

In evaluating an instrument that may qualify as a security, the Court looks to the "substance of the deal" rather than its "legal formalisms." <u>Arcturus Corp.</u>, 928 F.3d at 409. This means that the Court looks to "all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest." <u>SEC v. Merch. Cap., LLC</u>, 483 F.3d 747 (11th Cir. 2007) ("[I]t is not inappropriate that promoters' offerings be judged as being what they were represented to be.") (citing <u>SEC v. C.M. Joiner Leasing Corp.</u>, 320 U.S. 344, 353 (1943)).

For example, in <u>Bamert v. Pulte Home Corporation</u>, 445 F. App'x 256 (2011), the Eleventh Circuit contemplated plaintiffs' purchase of condominium units. The units were promoted as an "effortless" and essentially "risk free" investment. <u>Id.</u> at 258. The purchase agreements specifically stated that plaintiffs were not contractually obligated to "join the rental pool or otherwise contract with" OMC. <u>Id.</u> at 263. However, before closing, every plaintiff entered a contract with OMC to "rent, operate, and manage their units." <u>Id.</u> at 261. As part of the agreement, OMC paid all bills related to the condominium, including plaintiffs' mortgage, taxes, utilities, furnishings, and all other expenses, out of the rental

income and enjoyed the profits. See id. at 258. Plaintiffs benefitted through the appreciation of the land. See id.

The court carefully examined the substance of the deal, including the promotion of the properties as effortless and risk free. The Court found that *if* the unit purchases had not been "conditioned, either contractually or by practical necessity, on entry into the rental agreements with OMC, the[] rental agreements [would] constitute a voluntary delegation of managerial control by [p]laintiffs." Id. at 264. However, the Court found that—despite the language of the purchase agreements that plaintiffs were not required to contract with OMC—plaintiffs needed to enter the management contracts to participate in the scheme as advertised by OMC:

> Certainly, . . . Plaintiffs did retain extensive control over the units under the purchase agreement. But to participate in the scheme allegedly promoted by [Defendant], Plaintiffs needed to contract with OMC for the management of the properties as short-term rental units. And once they had so contracted with OMC, Plaintiffs no longer retained significant control over their units, and in turn, over their investments.

Id. at 266. The court concluded that based on the substance and realities of the deal, the instrument was properly considered a security. Id. at 267.

Considering the broad interpretation of Howey and the substance and economic realities of the transaction at hand, the Court finds that the sale of the Property constitutes a security for the purposes of federal securities law. In analyzing the parties' transaction, the Court looks to the entire scheme promoted by Defendants. The Property was specifically promoted with promises of extensive renovations and an affiliate leaseback agreement. See Record Documents 1-5 at 1-3 & 1-4 at 1-2. These representations were made in writing. See id. To find that Plaintiffs have stated a proper claim, the Court need not find that all leaseback agreements would constitute a security. But here, the Property

was marketed with a condition of sale being a leaseback agreement with a Mountain Express affiliate. See Record Document 1-3 at 1. The terms of the PSA, Fourth PSA Amendment, and Act of Sale all support the conclusion that the scheme Defendants promoted was not simply the sale of the Property but rather the sale of the Property in a soon-to-be renovated condition with a twenty-year tenant.

The substance of the transaction also evinces Plaintiffs' lack of control of the property. To participate in the scheme, Plaintiffs were explicitly expected to lease the Property back to a Mountain Express affiliate. The terms of the PSA indicate that Plaintiffs were obligated to do so. See id. Presumably, if Plaintiffs had not followed through and refused to lease the property to Defendants' affiliate, Defendants may have contemplated an action for breach of contract. If Plaintiffs had leased the property to another party, Defendants may have contemplated an action for breach of contract.

That Plaintiffs could theoretically have found another lessor after Mountain Express and its affiliate declared bankruptcy does not change the Court's conclusion. See Cameron, 608 F.2d at 193 (finding it "irrelevant" that the owners of outdoor campsite lots "might have refused to rent out their campsite lots or rented the sites out themselves" because regardless, the success of the investment was "inextricably wedded to the success" of the overarching rental business); see also C.M. Joiner Leasing Corp., 320 U.S. at 352-53 (explaining that an instrument should be evaluated based on the "character" it is given "by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect"). Even more so here. Plaintiffs' need to search for an alternate lessor—without the promised renovations—changes the nature of the

purchase entirely. Where Plaintiffs intended to possess a tract of land restored and with a twenty-year lessor, they were instead left with an as-is Property with no lessor.

The Court finds that both the second and third elements of the <u>Howey</u> test are met here. Plaintiffs have pled sufficient facts to raise an inference that their money was invested in a "common enterprise" under the Fifth Circuit's broad commonality approach because the success of their investment depended on Mountain Express's actions. <u>See</u> <u>BKK Solutions, LLC</u>, 2023 WL 11884719, at *4. Specifically, the success of the investment depended on the promises made both in the promotion and sale of the property: the promised renovations and leaseback agreement.

The materiality of the renovations was clearly evident to the parties. Not only was it included in the parties' discussion and initial PSA, but the Act of Sale specifically provides for a buyback within three months if certain renovations were not complete. <u>See</u> Record Document 1-5 at 2-3. This indicates the importance of the renovations to the transaction. Further, the value of the renovations can be inferred through the Property's purchase price of $915,000—a significant markup from the $350,000 Time and Water paid to acquire the Property less than one year prior. <u>See</u> Record Document 1 at ¶ 7, 21. The leaseback agreement was in no way a separate contract or transaction that Plaintiffs engaged in voluntarily—it was an explicit term of the Property's promotion and the PSA.

Plaintiffs have also pled sufficient facts to raise an inference that under the scheme, they were reliant on the efforts of other individuals for profit. <u>See</u> <u>Matter of Living</u> <u>Benefits Asset Mgmt., L.L.C.</u>, 916 F.3d at 535. Plaintiffs' Complaint avers that "the value attributed to the Property came solely from Mountain Express's ability to satisfy a long term triple net lease." Record Document 1 at ¶ 13. While the Court need not accept legal

conclusions set out in the Complaint as true, interpreting the word "solely" as one does in the context of the <u>Howey</u> test and viewing the realities of the transaction as a whole, the Court finds sufficient facts to demonstrate that the value did stem from the contractual promises made through the renovations, leaseback agreement, or both.[6] <u>See</u> <u>Iqbal</u>, 556 U.S. at 678. Plaintiffs' reliance on Mountain Express and its affiliates went beyond simply choosing the company to manage the property. <u>Cf.</u> <u>Williamson</u>, 645 F.2d at 423-24. Plaintiffs expected to generate profit from the renovated Property through the annual rent to be paid by their guaranteed lessor over the course of twenty years.

Therefore, all three elements of the <u>Howey</u> test are met. However, the Court pauses to address and dispose of two of Defendants' objections. First, that the fixed rate of return Plaintiffs expected means that the instrument is not a security. Second, that Plaintiffs emerged from the transaction with a parcel of land with inherent value means that the instrument is not a security. Both objections are meritless.

### iii.    Fixed Rate of Return

Defendants attempt to rely on a case from the District of Maine to argue that leaseback agreements with a fixed rate of return do not constitute securities. <u>See</u> Record Document 15-1 at 14 (citing <u>Lavery v. Kearns</u>, 792 F. Supp. 847 (D. Me. 1992)). In <u>Lavery</u>, the district court found that a lease and buyback agreement with a fixed payment term did not constitute a security because it did not satisfy the vertical commonality or broad commonality tests. <u>See</u> <u>Lavery</u>, 792 F. Supp. at 853-60. Here, Defendants argue that because Plaintiffs' expected return on their investment was annual rent payments, which

---

[6] The Complaint specifically avers that the purchase price of the Property was determined based on the leaseback opportunity rather than the fair market value of the property. <u>See</u> Record Document 1 at ¶ 13.

were fixed according to the parties' contractual terms, this transaction does not constitute a security. See Record Document 15-1 at 10-11. Plaintiffs correctly respond that—besides the fact that Lavery is an out-of-circuit district court decision—it is distinguishable from the instant dispute for several reasons. See Record Document 17-1 at 7.

First, as explained *supra*, the Fifth Circuit does not utilize a plain vertical or horizontal commonality test. Instead, it uses a "broad vertical commonality test." Matter of Living Benefits Asset Mgmt., L.L.C., 916 F.3d at 535. The Lavery court found that the instrument was not a security because the lease's fixed payment term "ma[de] it contractually impossible for Plaintiffs to share profits or losses with anyone" and their fortunes were therefore "not intertwined with those of the promoters." Lavery, 792 F. Supp. at 853. But that would not be dispositive under the Fifth Circuit's broad vertical commonality test. The Fifth Circuit approach "does not define . . . interdependence narrowly in terms of shared profits or losses." Long, 881 F.2d at 141. There can be interdependence even where the "promoter receives only a flat fee or commission rather than a share in the profits of the venture." Id.

Second, Lavery was decided before the United States Supreme Court decision in Edwards. In Edwards, the United States Supreme Court applied the Howey test to find that a payphone leaseback agreement qualified as a security. SEC v. Edwards, 540 U.S. 389 (2004). Under the leaseback agreement, plaintiffs purchased a payphone, which came with a five-year leaseback and management agreement. See id. at 391. The appellate court found that because the investors had a fixed rate of return, the instrument could not be a security. The Supreme Court reversed, reasoning that a fixed rate of return does not mean there is no interdependence. Id. at 394. The Court explained that when it

14

previously "held that 'profits' must 'come solely from the efforts of others,' [it] w[as] speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest." Id. at 394. Based on that explanation, there was no reason to exclude the leaseback as a security simply because there was a promise of a fixed return. See id.[7] Therefore, Defendants' argument based on the fixed rate of return fails.

### iv.    Ownership in Tract of Land

Defendants next argue that even without the renovations and the Mountain Express affiliate lessor, Plaintiffs emerged from the transaction with a piece of land that holds inherent value, which shows they were not dependent on any other party for profits. See Record Document 15-1 at 15. This argument is plainly foreclosed by Howey. Howey and its progeny have consistently distinguished two types of land contracts: On the one hand, land contracts wherein a plaintiff purchases a tract of land for personal use and/or where their expected return on investment is the appreciation of the value of the real estate; and on the other hand, land contracts wherein a plaintiff invests in a scheme wherein they rely on a promoter to generate profits through the land. Howey stated this explicitly, holding that where the three elements of its test are satisfied, "it is *immaterial* . . . whether there is a sale of property with or without intrinsic value." 328 U.S. at 301

---

[7] Defendants attempt to distinguish Edwards. They argue that in the instant transaction, the purchase did not involve multiple parcels of land, there were provisions for annual rent increases, and there is not a "ponzi scheme" here like that in Edwards. See Record Document 18 at 4. However, even in so arguing, Defendants point out that the crucial question before the Edwards Court was whether the fixed rate of return could satisfy the interdependence prong of the Howey test. See id. The various background facts Defendants point to here, including the number of pieces of land or property purchased and the overall business model did not appear in the Edwards Court's analysis. Further, the fact that there was a provision for rent increases does not change the fact that there was a fixed rate of return.

(emphasis added) (finding it significant that the investors purchasing tracts of land in a citrus grove had "no desire to occupy the land or to develop it themselves" but were "attracted solely by the prospects of a return on their investment").[8]

In short, Plaintiffs have pled sufficient facts to suggest that the transaction at issue meets the elements of the <u>Howey</u> test and is therefore a security for the purposes of federal securities law. None of Defendants' objections can overcome that conclusion. Accordingly, Defendants' 12(b)(6) Partial Motion to Dismiss is **DENIED** as to Plaintiffs' claims under the Securities Act of 1933.

## II.    Louisiana Blue Sky Laws

Defendants also move for dismissal of Plaintiffs' claims under Louisiana Blue Sky Laws. Section 712(A)(2) of the Louisiana Blue Sky Laws provides:

> It shall be unlawful for any person ... [t]o offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission.

La. R.S. 51:712(A)(2). Thus, in order to prevail in an action under the Louisiana Blue Sky Laws, a plaintiff must show: (1) the defendant made a false or misleading statement of a material fact or failed to state a material fact necessary in order to make the statement not misleading; (2) the plaintiff did not know of the untruth or omission; and (3) the defendant knew, or in the exercise of reasonable diligence, could have known, of the

---

[8] As discussed *supra*, this is not to say that all commercial purchase agreements, or even all such agreements containing leaseback provisions, constitute securities. However, the facts pled as to the substance of the instant transaction are sufficient such that the Court finds that the instrument constitutes a security at this stage.

untruth or omission. <u>See</u> <u>Ponthier v. Manalla</u>, 06-632 (La. App. 5 Cir. 1/30/07), 951 So. 2d 1242, 1255. Because the Louisiana Blue Sky Laws were modeled after the federal system, Louisiana courts consult federal jurisprudence for guidance in the application of the state's securities laws. <u>See e.g.</u>, <u>Dufour v. U.S. Home Corp.</u>, 581 So.2d 765, 768 (La. App. 4 Cir. 1991).

However, the Louisiana and federal standards are not identical. Louisiana Revised Statute 51:712(A)(2) "does not require a plaintiff to establish scienter, but . . . requires only a showing that the defendant was negligent." <u>Heck v. Triche</u>, 775 F.3d 265, 280 (5th Cir. 2014) (citing <u>Landry v. Thibaut</u>, 523 So.2d 1370, 1380 (La. App. 5 Cir. 1988), <u>writ denied</u>, 526 So. 2d 809 (La. 1988)). Louisiana law also differs in that it does not require a plaintiff prove they relied on the material misstatement or omission but does require a plaintiff prove the defendant themselves made the misstatement or omission. <u>See id.</u> at 280-81. Finally, while a plaintiff must plead all elements, "defendant must sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission." <u>Landry</u>, 523 So. 2d at 1380.[9]

Defendants' only argument that they are not liable under Louisiana Blue Sky Laws is that they did not make untrue statements in promoting the property. <u>See</u> Record Document 15-1 at 15. Defendants argue they did not know of Mountain Express's

---

[9] Under Louisiana Law, "[t]he defense of contributory negligence of the purchaser is [also] available." <u>Landry v. Thibaut</u>, 523 So.2d 1370, 1380 (La. App. 5 Cir. 1988), <u>writ denied</u>, 526 So. 2d 809 (La. 1988).

financial condition at the time of the transaction and had no obligation to determine Mountain Express's financial condition. See id. at 15 n.35.[10]

At the 12(b)(6) stage, the Court accepts the facts of the Complaint and its appropriate attachments as true. See Iqbal, 556 U.S. at 678. The Court notes at the outset that Defendants can be liable both for making materially untrue statements and for material omissions. See La. R.S. 51:712. According to the Complaint, Defendants made untrue statements by making "assurances that Mountain Express would undertake improvements on the Property" and representing that Mountain Express was an "expanding operator in its industry." See Record Document 1 at ¶ 18, 20. Also according to the Complaint, Defendants made material omissions by failing to disclose information about Mountain Express's financial condition, impending exit from the convenience store market, previous failures to honor other leaseback agreements, and Oak Street's refusal to purchase the property. See id. at ¶¶ 14-20.

Taking the facts as stated in the Complaint as true, Plaintiffs have stated a claim under Louisiana Blue Sky Laws sufficient to survive the motion to dismiss. Louisiana requires only a showing that a defendant was negligent in making material misstatements or omissions. See Landry, 523 So.2d at 1380. Plaintiffs' allegations raise a plausible inference that Defendants were negligent in making misstatements or omissions—either because they knew of Mountain Express's circumstances or because they negligently failed to investigate Mountain Express's circumstances.

---

[10] Plaintiffs respond that because Louisiana's securities laws are modeled after the federal system, Defendants' claims fail for the same reason as the federal claims. See Record Document 17-1 at 10.

Accordingly, Defendants' 12(b)(6) Partial Motion to Dismiss is **DENIED** as to Plaintiffs' claims under Louisiana Blue Sky Laws.

## CONCLUSION

Based on the reasons explained above,

**IT IS ORDERED** that Defendant TKG's 12(b)(6) Partial Motion to Dismiss (Record Document 15) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Gates's 12(b)(6) Partial Motion to Dismiss (Record Document 30) is **DENIED**.

An order consistent with this ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 12th day of March, 2025.

JUDGE S. MAURICE HICKS, JR.
UNITED STATES DISTRICT COURT